**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **NRPF GROUP TWO, LLC, et al.,** | ) | **PROPOSED** |
| | ) | **Jointly Administered Under** |
| | ) | **CASE NO. 26-53945** |
| **Debtors.** | ) | |

**DECLARATION OF KATIE S. GOODMAN**
**IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS**

I, Katie S. Goodman, declare under penalty of perjury as follows:

1.

I am the Managing Partner of the financial advisory firm GGG Partners, LLC ("**GGG**"). I have more than 20 years of experience in the practice of turnarounds and restructuring. Among my many engagements, I have acted as receiver, assignee in general assignments for the benefit of creditors, and Chief Restructuring Officer in matters filed under Chapter 11 of the United States Bankruptcy Code.

2.

GGG has been engaged by NRPF Group Two, LLC ("**NRPF**"), Neighborhood Restaurant Partners Florida, LLC ("**NRP FL**") Neighborhood Restaurant Partners Florida Two, LLC ("**NRP FL 2**")(collectively, the "**Debtors**")[1], Debtors and Debtors-in-possession in these cases, to serve as Chief Restructuring Officer, and I have been designated by GGG to fill such role. Since my engagement I have obtained knowledge of and experience with the business and financial affairs of the Debtors and I am authorized to submit this declaration in support of the

---

[1] The Debtors in these cases along with the last four digits of their federal tax identification number are: NRPF Group Two, LLC (0079); Neighborhood Restaurant Partners Florida, LLC (9185) and Neighborhood Restaurant Partners Florida Two, LLC (6462).

Debtors' First Day Motions (as hereinafter defined).  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided by employees under my supervision or professionals retained by the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  Opinions regarding compliance with applicable statutes or rules are based upon advice of counsel.  If I were called upon to testify, I would testify competently to the facts set forth herein.

## **Background**

3.

On March 24, 2026 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate its business as Debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.

NRPF is a Georgia limited liability company.  It is a holding company.  NRP FL and NRP FL 2 (collectively, the "**Operating Debtors**") are Delaware limited liability companies. Executive offices for all three Debtors are located in Atlanta, Georgia.  NRP FL is a wholly owned subsidiary of NRPF.  NRP FL and its wholly owned subsidiary NRP FL 2, are franchisees owning Applebee's Neighborhood Bar & Grill ("**Applebee's**") restaurants in Florida, Georgia and Alabama.  Applebee's is a prominent American casual dining restaurant chain operating over 1,500 locations worldwide.  It offers affordable, traditional American comfort food alongside cocktails in a relaxed, family-friendly setting.

5.

NRP FL was formed to acquire fifty (50) Applebee's restaurants in the Tampa and Orlando markets from a long-time franchisee of the brand. The initial acquisition of the 50 restaurants was completed in May, 2012. There was a subsequent acquisition of an additional 15 Applebee's restaurants by NRP FL 2 from another franchisee which was completed in December, 2012. The 15 additional restaurants were located across Florida, Georgia and Alabama.

6.

The Debtors' business enjoyed a period of growth from 2013 through 2015, both from new restaurant development and organically. The companies' combined EBITDA grew from $13 million to over $20 million in 2015. Unfortunately, toward the end of 2015 sales began to soften and the companies then experienced periods of ups and downs, as they battled through various unsuccessful strategies and promotions, the COVID-19 pandemic and the inflationary pressures presently impacting the entire restaurant industry. During FYE 2025, in an effort to stem losses the Debtors were forced to make the difficult decision to close 9 restaurants. While a number of the stores are profitable, the Debtors' combined EBITDA was negative during the past year. Inflationary pressure has continued to increase the Debtors' operating expenses, while concomitantly impacting the Debtors' core customer base, thereby resulting in less restaurant visits and lower average tickets.

7.

In light of the ongoing financial headwinds impacting the Debtors' operations, the Debtors made a decision during early 2025, to try to find one or more investors to purchase the Debtors' restaurants and related assets, and, in connection therewith, to assume the related leases and franchise agreements. In March 2025, the Debtors retained Citizens Bank, a respected investment banking firm with substantial restaurant industry experience to oversee that sale process.   The process lasted approximately 4-5 months but ultimately did not succeed.  Contact was made with over 83 groups, with 17 showing some form of initial interest, but Citizens Bank was ultimately unable to find any buyers willing to purchase the Debtors' assets and assume the associated leases and franchise agreements.   Notwithstanding the closure of certain nonperforming restaurants during 2025, feedback indicated that a number of additional restaurants with uneconomical leases would need to be closed and/or significant concessions negotiated with landlords and/or the franchisor in order to attract more interest from potential purchasers.   In that regard, an additional 5 restaurants have been closed during the first quarter of 2026, and the Debtors currently operate 53 restaurants.

8.

Despite the failed marketing effort, the Debtors continued to explore restructuring alternatives that would permit most if not all of the restaurants operated by the Debtors to remain open and preserve jobs for the Debtors' workforce.  In February 2026, a tentative agreement in principle was reached with an affiliate of the Debtors' Applebee's franchisor ("**Applebee's**"), a subsidiary of Dine Brands Global, Inc. Under that agreement Applebee's would acquire approximately 53 of the Applebee's restaurants and related leases and agreements.   An effort

was undertaken with the Debtors' lender, Equity Bank, to negotiate an arrangement which would have facilitated an out-of-court transaction.   However, the parties had not been able to finalize such an arrangement as of the Petition Date.  And the continuing financial issues facing the Debtors and the resulting constraint on the Debtors' cash flow forced them to make the difficult decision to seek relief under Chapter 11 in order to seek to consummate the transaction as a going-concern sale under Section 363 of the Bankruptcy Code.  Applebee's has indicated that it will  support the Debtors in this process, and it is expected that Applebee's and the Debtors will in the near future reach agreement on a stalking horse asset purchase agreement which will serve as the basis of a sale process.  The Debtors hope to complete that process and close on a sale by mid-May, 2026.

### The First Day Motions

9.

In conjunction with filing their bankruptcy cases, the Debtors filed the motions and applications listed on Exhibit A attached hereto (collectively, the "**First Day Motions**").  I submit this declaration in support of the First Day Motions.  I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

10.

As a result of my first-hand experience, and through my review of various materials and

other information, discussions with other of the Debtors' executives and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.  As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as Debtors-in-possession.

**Notice of Designation of Complex Chapter 11 Case**

11.

Pursuant to the *Second Amended and Restated General Order 26-2019, Procedures for Complex Chapter 11 Cases*, dated February 6, 2023, the Debtors request the entry of an order designating these Chapter 11 cases as complex cases. The Debtors believe these cases qualify as complex Chapter 11 Cases because: (a) there are more than 100 parties in interest in these cases, excluding former and current employees; (b) the Debtors are not individuals; and (c) the Debtors do not own single asset real estate.

**<u>Motion for Joint Administration</u>**

12.

The Debtors are requesting that the Court jointly administer the Debtors' related bankruptcy cases (collectively, the "**Chapter 11 Case**") in order to promote judicial efficiency and to minimize the administrative expense to each of the Debtors' estates.  As noted above,

NRPF is the sole member of NRP FL, which in turn is the sole member of NRP FL 2.  Joint administration and the maintenance of a single docket will streamline the bankruptcy process, minimize confusion among the creditor body from receipt of multiple pleadings for each Debtor and minimize the administrative expense to the Debtors' estates.  Therefore, joint administration is in the best interest of the Debtors, their creditors and their estates.

### Application for Authority to Retain Scroggins, Williamson & Ray, P.C. as Counsel for the Debtors (the "SW&R Application")

13.

The Debtors require the services of an experienced bankruptcy law firm to shepherd them through Chapter 11.  To that end, the Debtors seek to retain the services of Scroggins, Williamson and Ray, P.C ("**SW&R**").  SW&R is clearly experienced with and capable of handling complex Chapter 11 cases and has been counseling the Debtors for several weeks prior to the Petition Date.  Accordingly, the Debtors submit that it is necessary and in the best interests of their creditors and estates to engage SW&R to serve as the Debtors' bankruptcy counsel through the conclusion of these Chapter 11 cases.

### Application for Authority to Retain GGG Partners, LLC to Provide Interim Management Services (the "GGG Application")

14.

In addition to legal services, the Debtors require the services of an experienced firm to provide interim management services to help guide them through Chapter 11 and to assist the Debtors in preparing and filing various reports.  To that end, the Debtors seeks to retain the services of GGG Partners, LLC ("**GGG**").  GGG is very experienced in providing such services to debtors in complex Chapter 11 cases and has been counseling the Debtors for a number of

months prior to the Petition Date.  Accordingly, the Debtors submit that it is necessary and in the best interests of its creditors and estate to engage GGG to provide interim management services to Debtors through the conclusion of this Chapter 11 Case.

**Application for Authority to Retain Epiq Corporate Restructuring, LLC as
Claims, Noticing, and Balloting Agent for the Debtors (the "Epiq Retention Motion")**

15.

The Debtors believe it is necessary and in the best interests of their creditors and estates to engage Epiq Corporate Restructuring, LLC ("**Epiq**") to act as outside agent to the Clerk of the Bankruptcy Court to assume full responsibility for the distribution of notices and proof of claim forms and the maintenance, secondary processing, and docketing of all proofs of claim filed in the Debtors' bankruptcy cases.  Epiq provides comprehensive bankruptcy management services, including data processing, noticing, claims processing, and other administrative tasks in Chapter 11 cases.  In addition, in connection with any plan of reorganization proposed by the Debtors, the Debtors have determined that they will require the services of Epiq with respect to the mailing of the Debtors' disclosure statement, plan, and ballots and in maintaining and tallying the ballots in connection with the voting on such plan.

**Application For Authority To Retain SC&H Group
as Investment Banker to the Debtors (the "SCH Application")**

16.

As noted above, the Debtors filed this Chapter 11 Case in order to seek to consummate a going-concern sale of their assets under Section 363 of the Bankruptcy Code, and through such sale transaction preserve jobs and maximize value for their estates and creditors.  Applebee's has indicated that it will  support the Debtors in this process, and it is expected that Applebee's and the Debtors will in the near future reach agreement on a stalking horse asset purchase agreement

- 8 -

which will serve as the basis of a sale process.  The Debtors hope to complete that process and close on a sale by  mid-May, 2026.  In connection therewith, the Debtors have filed the SCH Application seeking authority to employ SC&H Group ("**SC&H**") as their Investment Banker during the pendency of these cases, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, and Bankruptcy Rules 2014 and 2016, and to obtain approval of the terms under which SC&H will be compensated, at the expense of the Debtors' estates and on the terms set forth in the engagement agreement with SC&H dated as of March 20, 2026 (the "**Engagement Agreement**") to provide the Debtors with investment banking services.  The form of the Engagement Agreement is attached to the SCH Application as Exhibit B.  The compensation arrangements contained in the Engagement Agreement are highly beneficial to the Debtors' estates as they provide certainty and proper inducement for SC&H to act expeditiously and prudently with respect to the matters for which it will be employed.

17.

Since March of 2026, SC&H has worked diligently on the matters for which it was engaged, and, as a result, has become uniquely situated to provide investment banking services to the Debtors in pursuit of restructuring, refinance or sale transactions.  The Debtors have chosen SC&H to act as their investment banker postpetition because SC&H has substantial expertise in distressed mergers and acquisitions, financing and other transactions.  The Debtors submit that SC&H is well qualified to perform these services and represent the interests of the Debtors in these Chapter 11 cases.  The terms and conditions of the Engagement Agreement were negotiated by the Debtors and SC&H at arm's length and in good faith.  The Debtors

respectfully submit that the provisions contained in the Engagement Agreement are reasonable and in the best interests of the Debtors, their estates, and their creditors.

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors; and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (III) Granting Related Relief (the "Notice Procedures Motion")**

18.

The Debtors request authority to file a single consolidated list of their 30 largest general unsecured creditors (the "**Consolidated Top 30 List**"). A large number of creditors may be shared amongst the Debtors. The Consolidated Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.  Additionally, the Debtors request authority to establish certain procedures for providing notice to parties of the commencement of the Chapter 11 Case and of other related information (the "**Notice of Commencement**"). In particular, the Debtors request authority for the Noticing Agent to serve the Notice of Commencement on all parties entitled to notice of commencement of the Chapter 11 Case. This will ensure that the Debtors' creditors and stakeholders receive prompt notice of the commencement of the Chapter 11 Case and the Meeting of Creditors.  The Debtors believe that the notice procedures requested in the Notice Procedures Motion are in the best interests of their estates and creditors, and will not prejudice the rights of any party in interest in this case.

**Motion for Authority to (A) Maintain Existing Bank Accounts and Cash Management System, and (B) Continue Use of Existing Business Forms (the "Cash Management Motion")**

19.

Prior to the commencement of this Chapter 11 Case, the Debtors maintained approximately twenty-nine (29) bank accounts with various depository institutions, a schedule of which is attached to the Cash Management Motion as Exhibit A. The Debtors' primary cash management bank is currently Chase Bank ("**Chase**"), although accounts are also maintained at other financial institutions as listed on Exhibit A to the Cash Management Motion. In general, the Debtors' cash management system operates as follows:

a.  The Debtors now maintain their primary operating accounts with Chase, which collect payments on accounts from third-party payors.

b.  The Debtors also maintain various depository accounts (the "**Depository Accounts**") with various banks such as Truist, Bank of America, Synovus, Regions Bank and Ameris Bank in the Debtors' various operating locales (the "**Local Banks**"), for purposes of receiving cash deposits.

c.  The Debtors also maintain payroll accounts and accounts payable accounts with Chase, which are zero based accounts that sweep from the Operating Account when checks and drafts are processed by Chase.

20.

To avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtors, and to ensure an orderly transition into Chapter 11, the Debtors respectfully request entry of an Order (i) authorizing the Debtors to continue to maintain their existing bank accounts with Chase and to utilize their cash management system, with the proviso that Chase will designate such accounts as "Debtor in Possession" accounts; (ii) authorizing the Debtors to continue to use the Depository Accounts with the proviso that such banks will

designate such accounts as "Debtor in Possession" accounts; and (iii) granting a waiver, to the extent required, from the United States Trustee's guidelines with respect to the Depository Accounts maintained at the Local Banks.

21.

It is critical for the Debtors to be able to continue their existing cash management system during the pendency of these Chapter 11 cases. Any disruption to the Debtors' ordinary business affairs at this critical state in the reorganization process could adversely impact their ability to successfully reorganize. Consequently, maintenance of the existing cash management system is in the best interests of all creditors, parties-in-interest, and the Debtors' estates. The Debtors will continue to maintain strict records with respect to all transfers of cash so that they may readily provide an accounting thereof.

**Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

22.

The Debtors request the entry of an interim and final order (the "**Interim Order**" and the "**Final Order**", respectively), pursuant to Section 366 of the Bankruptcy Code: (a) prohibiting the Utility Companies from altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming utilities adequately assured of future performance, and (c) establishing the Determination Procedures (as defined in the Utilities Motion) for determining adequate assurance of payment. The Debtors also request that the Court schedule a final hearing at its convenience on a date in advance of the expiration of thirty (30) days following the Petition Date.

- 12 -

23.

Utility services are essential to the Debtors' ability to sustain operations while this Chapter 11 Case is pending.  In the normal conduct of its business, the Debtors have direct relationships with approximately 60 utility companies (collectively, the "**Utility Companies**") for the provision of electric, water, gas, telephone, internet, and other services (the "**Utility Services**").  A list identifying the Utility Companies is attached to the Utilities Motion as <u>Exhibit C</u> (the "**Utilities Service List**").[2]

24.

Prior to the Petition Date, the Debtors have always attempted to remain current with regard to their utility bills and, to the best of my knowledge, the Debtors are current on all amounts owing to the Utility Companies, other than payment interruptions that may be caused by the commencement of this Chapter 11 case.

25.

Continued and uninterrupted Utility Service is vital to the Debtors' ability to sustain their operations during the Chapter 11 case.  If the Utility Companies were to terminate or disrupt service to the Debtors, the Debtors would almost certainly need to go out of business.

26.

The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner and expects that they will have funds sufficient to pay all post-petition utility obligations in the ordinary course of business.  Nevertheless, to provide adequate assurance of payment for future services, the Debtors are proposing the following (collectively, the "**Proposed Adequate Assurance**"):

---

[2] The listing of any entity on **Exhibit C** attached to the Utilities Motion is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code.

a. **<u>Bond or Surety</u>**-  Prior to the Petition Date, the Debtors posted a bond or surety in favor of those Utility Companies identified on Exhibit C to the Utilities Motion with an amount shown in the column labeled Bond Deposit.  The Debtors propose (i) that the bond and/or surety remain in place post-petition and (ii) that the Debtors be authorized to pay in the ordinary course of business an amount equal to the current invoice for which a portion of the services rendered relate to a pre-petition period  as adequate assurance of payment for future services and no other adequate assurance be required.

b. **<u>Security Deposit</u>**-     Prior to the Petition Date, the Debtors posted a security deposit with the Utility Companies identified on Exhibit C to the Utilities Motion with an amount shown in the column labeled Cash Deposit.  The Debtors propose (i) that the Utility Companies holding such deposits be authorized to retain the pre-petition security deposit post-petition and (ii) that the Debtors be authorized to pay in the ordinary course of business an amount equal to the current invoice for which a portion of the services rendered relate to a pre-petition period    as adequate assurance of payment for future services and no other adequate assurance be required.

c. **<u>Payment of Invoice</u>**- For the Utility Companies identified on Exhibit C to the Utilities Motion without an amount listed in either column labeled Bond Deposit or Cash Deposit, the Debtors propose that the Debtors be authorized to pay in the ordinary course of business an amount equal to the current invoice for which a portion of the services rendered relate to a pre-petition period, and such payment

constitute adequate assurance of payment for future services and no other adequate assurance be required.

27.

The Debtors submit that the Proposed Adequate Assurance, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional assurance is required, they may request such assurance pursuant to the Determination Procedures described in the Utilities Motion.

**Motion for Authority to Pay Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses and Other Compensation to Employees and Independent Contractors (the "Wages and Benefits Motion")**

28.

As of the Petition Date, the Debtors employed on a combined basis approximately 2,000 employees and independent contractors.

29.

The Debtors have incurred certain pre-petition obligations related to their employees that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "**Employee Obligations**") will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date. These obligations can generally be categorized as follows: (i) wages, salaries, and other compensation; (ii) payroll taxes; (iii) qualified 401(k) plan obligations; (iv) health and welfare benefits; and (v) other benefits.

30.

Pursuant to Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, a debtor's

employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within one hundred eighty (180) days before the Petition Date, and claims against a debtor for contributions to employee benefit plans arising from services rendered within one hundred and eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent the claims do not exceed $17,150.  11 U.S.C. §§ 507(a)(4)–(5).  The Debtors believe that substantially all of the Employee Obligations constitute priority claims and no employees are entitled to payment of Employee Obligations which exceed the statutory limit provided in Sections 507(a)(4) and 507(a)(5).  Therefore, the Debtors submit that payment of such amounts at this time is necessary and appropriate.

31.

Any delay in paying the Employee Obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely in order for their businesses to be successful.  The Debtors must have the support of their employees in order for the Debtors to maximize the going concern value of their assets.  At this early stage, the Debtors simply cannot risk the substantial damage to its business that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

32.

Moreover, absent an order granting the relief requested in this Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.  The stability of the Debtors will thus be undermined, perhaps irreparably,

by the possibility that otherwise loyal employees will seek other employment alternatives.

**Motion For an Order Authorizing the Debtors
to Maintain and Administer Customer Programs and Honor
Certain Pre-Petition Obligations Related Thereto (the "Customer Programs Motion")**

33.

In the ordinary course of the Debtors' business, and as is customary in the industry, the Debtors offer and participate in certain customer programs and practices, including but not limited to, the following: (1) prepaid gift cards; (2) various coupon, discounts, promotions and other similar policies, programs, and practices; (3) post-petition customer refunds; and (4) certain other miscellaneous programs (collectively, the "**Customer Programs"**).

34.

The Customer Programs are designed to enhance customer satisfaction, develop and sustain customer relationships and loyalty, improve profitability and ensure that the Debtors remain competitive in the industry. Therefore, the Debtors' ability to honor the Customer Programs in the ordinary course of business is necessary to retain their customer base and reputation within the industry.  Any inability of the Debtors to honor these obligations promptly would be disastrous to the survival of the Debtors' business as a going concern because of the resulting destruction of goodwill and loss of customer patronage.

35.

The Customer Programs are more particularly described as follows:

a. **Gift Cards**.  Gift cards (collectively, the "**Gift Cards**") can be purchased at any Applebee's restaurant location nationwide, at a variety of traditional retailers, through select rewards programs, and on Applebee's secure website. A Gift Card may then be redeemed at any time, with no expiration date, at any Applebee's location, including those owned by the Debtors.

- 17 -

The Gift Cards program for all Applebee's franchises is administered by Stored Value Systems (the "**Processor**"), which tracks where every Gift Card is purchased and redeemed. The Processor makes weekly deposits into the Debtors' accounts for net receivables due to the Debtors for Gift Cards redeemed at their locations. The amount of the weekly net receivable is equal to the amount of Gift Cards sold by a third party but redeemed in the Debtors' stores, less the amount of Gift Cards sold in the Debtors' stores but redeemed at other Applebee's locations. The Debtors' net receivables as of the Petition Date were Two Hundred Eighty Three Thousand Seven Hundred Seventy and NO/100 Dollars ($283,770.00) in the aggregate. The Processor debits a monthly fee from the Debtors' accounts equal to 10% of the amount of Gift Cards redeemed in the Debtors' locations (collectively, the "**Processor Fees**"). The Debtors estimate that, as of the Petition Date, approximately Thirty Thousand and NO/100 Dollars ($30,000.00) in Processor Fees is accrued and unpaid.

b.  **Promotions**. The Debtors, or Applebee's, from time-to-time, issue coupons, discounts and promotions (collectively, the "**Promotions**") that are redeemable for a certain dollar amount, percentage discount, or free meal. For example, Promotions are offered through Applebee's E- Club mailing list (the "**E-Club**"). As of the Petition Date, there were more than 306,521 customers enrolled as E-Club members (collectively, the "**Members**"). Applebee's issues "welcome" coupons to new Members and birthday coupons to Members to drive more business. Redemptions of the Promotions offered under the E-Club vary greatly from month-to-month.

c.  **Customer Refunds**.  In the ordinary course of its business, the Debtors offer refunds to guests that contact the Debtors regarding an unsatisfactory experience at one of the Debtors' locations (collectively, the "**Customer Refunds**"). The Debtors issue the Customer Refunds in the hopes of retaining the customers as future guests, and to maintain the Debtors' reputation among its customers. The Customer Refunds are issued by Gift Cards, and the Debtors' obligations related to Customer Refunds are thus subsumed in the Gift Cards program discussed above.

d.  **Local Incentive Programs**.  From time to time the Debtors run local promotional programs that provide customers with discounts or incentives with the purpose of driving frequency and loyalty (collectively, the "**Local Incentive Programs**"). The Local Incentive Programs may include programs such as free meals for veterans on Veterans Day; lunch-punch cards or similar cards, which provide a free entrée or discount after the purchase of a select number of full price entrées; charitable donations, including through cash donations and sponsorships; and locally generated coupons/cards valid for discounts or free or discounted appetizers, entrées, or desserts, as specified on such coupons/cards.

**Motion of the Debtors for an Order,
Pursuant to 11 U.S.C. §§ 105(A) and 363, Authorizing
the Debtors to Pay Pre-Petition Sales and Use
Taxes and Authorizing Financial Institutions to Honor and Process
Checks and Transfers Related to Such Relief (the "Sales Tax Motion")**

36.

In connection with the normal operation of their businesses in the ordinary course, the Debtors collect sales and use taxes (collectively, the "**Sales and Use Taxes**") from their customers (and pay such taxes on behalf of certain vendors through direct pay certificates) on behalf of various state and local taxing authorities (the "**Taxing Authorities**") for payment to such Taxing Authorities. On a periodic basis, typically monthly, the Debtors pay to the Taxing Authorities all previously collected Sales and Use Taxes via funds drawn by checks or by means of electronic fund transfers.

37.

The Debtors estimate that Sales and Use Taxes collected but not paid to the Taxing Authorities as of the Petition Date is approximately $610,806.33, as set forth on Exhibit B to the Sales Tax Motion. In addition, prior to the Petition Date, certain Taxing Authorities were sent checks (the "**Checks**") with respect to such obligations that may not have cleared the Debtors' banks or other financial institutions (together, the "**Banks**") as of the Petition Date.

38.

In the Sales Tax Motion the Debtors seek authority to pay all pre-petition Sales and Use Tax obligations owed to the Taxing Authorities. Also, to the extent the Checks have not cleared the Banks as of the Petition Date, the Debtors seek an order authorizing the Banks to honor the Checks, and to rely on the Debtors' representations as to which Checks may and may not be cleared, without any liability to any third party. In addition, to the extent the Taxing Authorities

- 19 -

have otherwise not received payment for prepetition Sales and Use Taxes due to them, the Debtors seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary to pay all outstanding Sales and Use Tax obligations due as of the Petition Date.

39.

My understanding is that (a) Sales and Use Taxes are afforded priority status under Section 507(a)(8) of the Bankruptcy Code and, therefore, must be paid in full before any general unsecured obligations of a debtor may be satisfied, and (b) to the extent that the Debtors have collected Sales and Use Taxes from their customers, such funds are held in trust by the Debtors for the benefit of the Taxing Authorities and do not constitute property of the Debtors' estates.. Moreover, many state statutes hold responsible officers and directors of collecting entities personally liable for sales and use taxes owed by those entities.  The risk of such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their officers and members from administering the Debtors' estates and preserving the value of the Debtors' assets for the benefit of creditors.

**Motion for Authority to Use Cash Collateral ("Cash Collateral Motion")**

40.

The Cash Collateral Motion seeks the entry of an order (a) authorizing the Debtors to use cash collateral, (b) granting adequate protection, and (c) scheduling a final hearing (the "Final Hearing").

41.

As of Petition Date, the Debtors were indebted to Equity Bank ("**Equity Bank**") in the total approximate amount of $13,184,000.00 (collectively, the "**Prepetition Equity Bank**

**Obligations**"), under various loan agreements, promissory notes, guaranties and security agreements, all dated on or about November 19, 2020 (collectively, the "**Prepetition Equity Bank Loan Documents**").   The Debtors understand that Equity Bank contends that the Prepetition Equity Bank Obligations are secured by a first priority lien on all of the Operating Debtors' assets including, among other things, real property, personal property, accounts receivable and inventory (the "**Prepetition Equity Bank Collateral**"), and that the proceeds received from such Prepetition Equity Bank Collateral would be "cash collateral" as defined in Section 363(a) of the Bankruptcy Code.

42.

As of Petition Date, the Operating Debtors were indebted to U.S. Foods, Inc. ("**U.S. Foods**") in the total approximate amount of $1,187,000.00 (collectively, the "**Prepetition U.S. Foods Obligations**"), under various agreements, promissory notes, and security agreements (collectively, the "**Prepetition U.S. Foods Loan Documents**").   The Debtors understand that U.S. Foods contends that the Prepetition U.S. Foods Obligations are secured by a purchase money security interest in food inventory and other goods purchased by the Operating Debtors from U.S. Foods (the "**Prepetition U.S. Foods Collateral**").   The Debtors also believe that U.S. Foods would contend that the proceeds received from such Prepetition U.S. Foods Collateral would be "cash collateral" as defined in Section 363(a) of the Bankruptcy Code.   The Debtors estimate that the value of the Prepetition U.S. Foods Collateral as of March 22, 2026 was approximately $650,000.  Additionally, the value of goods delivered to the Operating Debtors by U.S. Foods during the twenty days immediately prior to the Petition Date is at least $1,766,000.

43.

Prepetition UCC searches with the Delaware Secretary of State indicate that: (a) Equity Bank did not file any UCC-1 financing statements purporting to perfect its alleged security interests in the Operating Debtors' assets until February 17, 2026 (the "**Equity Bank UCC's**"), and (b) U.S. Foods filed its original UCC-1 financing statement purporting to perfect its security interest in the Operating Debtors' assets on February 22, 2013, amended such statement on March 31, 2015 to limit the collateral to goods purchased by the Operating Debtors from U.S. Foods, continued such statement on February 13, 2018, and further continued such statement on January 3, 2023.

44.

The Debtors contend that the Equity Bank UCC's are avoidable as preferential transfers under Section 547 of the Bankruptcy Code, and that, once the Equity Bank UCC's are avoided, Equity Bank's liens are unperfected with regard to the Debtors' personal property, accounts receivable and other intangible assets, and therefore subject to avoidance pursuant to Section 544 of the Bankruptcy Code.

45.

The Debtors are willing to provide adequate protection to U.S. Foods in the form of payment in full of their prepetition claim.  Given that all or substantially all of the U.S. Foods Obligations (a) appear to be secured by an unavoidable first priority lien in the Prepetition. U.S. Foods Collateral, (b) are subject to administrative priority under Section 503(b)(9), on account of goods delivered to the Debtors within twenty (20) days prior to the Petition Date, and (c) some or all of such claim is likely subject to the Perishable Agricultural Commodities Act (Chapter 20A of Title 7 of the United States Code), and therefore is at least partly protected by a statutory

- 22 -

floating trust that attaches to produce, products derived from it, and the proceeds of sale of that produce, the Debtors have determined that the most prudent course is simply to pay the Prepetition U.S. Foods Obligations. With regard to Equity Bank, as noted above, the Prepetition Equity Bank Obligations will almost certainly be treated as general, unsecured claims, and therefore, the Debtors are willing to provide adequate protection to Equity Bank for the use of cash collateral (to the extent any of the cash held by the Debtors constitutes Equity Bank's cash collateral) by granting adequate protection liens, and by using the cash collateral only for those items set forth in a budget to be approved by the Court, on the terms of the proposed order attached to the Cash Collateral Motion as Exhibit B.

46.

The Debtors' use of cash collateral is essential to maintain the value of the Debtors' property and for an effective monetization of the Debtors' assets. The Debtors do not propose to use cash collateral to pay any amounts due and owing prior to the Petition Date unless approved by order of the Court. However, the Debtors must have use of cash collateral to meet the Debtors' ongoing obligations and to preserve the value of their assets. Therefore, the use of cash collateral is in the best interest of the Debtors, their estates and their creditors.

**First Omnibus Motion Seeking Entry of an Order Authorizing Debtors
to Reject Executory Contracts and Unexpired Leases
<u>Effective as of the Petition Date (the "Rejection Motion")</u>**

47.

The Rejection Motion seeks entry of an order pursuant to 11 U.S.C. §§ 365 and 105(a), rejecting unexpired nonresidential real property leases ("**Leases**") and executory contracts

("**Contracts**"; and, together with the Leases, the "**Leases and Contracts**") set forth on Exhibit A attached to the Rejection Motion.

48.

The Debtors seeks authority to reject the Leases and Contracts because they are burdensome and have little or no value to the Debtors, their creditors or the Debtors' estates. The facilities associated with the Leases have been operated by the Debtors as Applebee's restaurants. The restaurants at those locations (collectively, the "**Subject Stores**") proved unprofitable. Some of the Subject Stores were closed prior to the Petition Date ("**Pre-Petition Closed Stores**"). The Contracts consist of the Debtors' Applebee's Franchise Agreements relating to the Subject Stores. Out of an abundance of caution the Debtors seek to reject Leases and Contracts associated with Pre-Petition Closed Stores to prevent any obligations under these Leases and Contracts from accruing post-petition.[3] The Debtors desire to close Subject Stores which were not closed pre-petition, and to reject any Leases and Contracts relating thereto, in order to avoid incurring unnecessary administrative expense and to preserve assets of the Debtors' estates. In my view the decision to reject the Leases and Contracts as of the Petition Date is clearly an exercise of sound business judgment.

## Conclusion

Accordingly, for the reasons stated herein, and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

---

[3] In the Rejection Motion the Debtors are reserving their right to argue that any or all of the Leases and Contracts relating to Pre-Petition Closed Stores were terminated prior to the Petition Date.

- 24 -

Executed this 24th  day of March, 2026.


/s/ Katie Goodman
Katie S. Goodman
CRO


*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**
**INDEX OF FIRST DAY MOTIONS**

| | |
|---|---|
| 1. | Notice of Designation of Complex Case |
| 2. | Motion for Joint Administration |
| 3. | Application for Entry of an Order Authorizing the Debtors to Retain and Employ Scroggins, Williamson & Ray, P.C. as Counsel for the Debtors and Debtors in Possession as of the Petition Date |
| 4. | Application for Approval to Retain GGG Partners LLC (I) to Provide Interim Management Services, (II) Designate Katie S. Goodman as Chief Restructuring Officer for the Debtors and (III) to Provide Certain Additional Personnel in Support Thereof |
| 5. | Motion for Authority to Retain Epiq Corporate Restructuring, LLC as Claims, Noticing, and Balloting Agent for the Debtors |
| 6. | Application For Authority To Retain SC&H Group as Investment Banker to the Debtors |
| 7. | Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors; (II) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (III) Granting Related Relief |
| 8. | Motion for Authority to Maintain Existing Bank Accounts and Cash Management System |
| 9. | Debtors' Emergency Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment |
| 10. | Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses, and Other Compensation to Employees and Independent Contractors |
| 11. | Motion for an Order Authorizing the Debtors to Maintain and Administer Customer Programs and to Honor Certain Pre-Petition Obligations Related Thereto |
| 12. | Motion of the Debtors for an Order, Pursuant to 11 U.S.C. §§ 105(a) and 363, Authorizing the Debtors to Pay Pre-Petition Sales and Use Taxes and Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief |
| 13. | Motion for Authority to Use Cash Collateral |
| 14. | First Omnibus Motion Seeking Entry of an Order Authorizing Debtors to Reject Executory Contracts and Unexpired Leases Effective as of the Petition Date |